UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Pateley Associates I, LLC and Pateley Associates, LP, *Plaintiffs*, <br><br> *v.* <br><br> Pitney Bowes, Inc., *Defendant*. | Civil No. 3:08cv1607 (JBA) <br><br><br><br> March 31, 2010 |

RULING ON DEFENDANT'S MOTION TO DISMISS AND
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Pitney Bowes, Inc. ("PBI") has moved to dismiss the nine-count Third Amended Complaint filed by Plaintiffs Pateley Associates LP ("Pateley LP" or the "LP") and Pateley Associates I, LLC ("Pateley LLC" or the "LLC"), and Plaintiffs have moved for summary judgment on their claim of breach of contract alleging PBI's failure to defend them in a lawsuit brought against them by the Innis Arden Golf Club ("IAGC"). For the reasons that follow, PBI's motion to dismiss will be denied, PBI's motion to seal an exhibit will be granted, and Plaintiffs' motion for partial summary judgment will be granted.

I.      Background

Between 1967 and 1978, PBI held in fee simple the land located at 23 Barry Place in Stamford, Connecticut ("Barry Place"), and owned and occupied the land as well as its buildings and structures. Around December 13, 1978, it conveyed an estate for years until January 1, 2004 in the land to Pateley LP with a remainder interest to Hirey Realty Corporation ("Hirey") and sold the buildings, structures, and improvements to Pateley LP. Hirey and Pateley LP entered into an option agreement that would allow Pateley LP to lease Barry Place after its estate for years in the property expired in 2004. Also around December 13, 1978, after obtaining its estate for years, Pateley LP entered into a "hell and high water

bond net lease" agreement with PBI (the "Lease"), under which it leased Barry Place back to PBI.  Subject to an option agreement, PBI could continue to lease Barry Place past the expiration of the Lease, but pursuant to the same terms.

On March 21, 2001, pursuant to the "Limited Liability Company Agreement of Pateley Associates LLC" (the "LLC Agreement"), Pateley LP created Pateley LLC and assigned to the LLC its ownership interest—as encumbered by the Lease executed with PBI—in Barry Place.  Thereafter, on August 1, 2001, the LLC obtained a mortgage ("Mortgage and Security Agreement") on Barry Place from Morgan Stanley Dean Witter Mortgage Capital Inc. ("Morgan Stanley").  Also on August 1, 2001, Hirey's successor, Whisper Capital LLC ("Whisper"), entered into an agreement with Pateley LLC, under which the LLC exercise the 1978 option to lease the land, and the LLC and PBI agreed that PBI would sub-lease Barry Place from the LLC.

Plaintiffs allege that PBI was the sole occupant of Barry Place between 1967 and 2009. During that period, PBI was allegedly tasked with

> (a) applying to the U.S. Environmental Protection Agency ("EPA") for an EPA hazardous waste identification number; (b) generating hazardous waste at the Facility; (c) constructing, managing, and using a hazardous waste storage area to store hazardous wastes, including waste degreasing solvents; (d) managing the design, construction, use and removal of underground tanks, piping and other ancillary equipment containing petroleum or hazardous substances at the Facility; (e) using hazardous substances in its operations at the Facility, including in its assembly operations, testing laboratory, and maintenance activities; (f) managing the use of electrical transformers at the Facility, including the handling of PCB-contaminated dielectric fluids and responding to a release of dielectric fluids from leaky valves on the transformers; and (g) filing with the Connecticut Department of Environmental Protection ("DEP") a notice of Significant Environmental Hazard identifying the presence of elevate concentrations of PCBs in soil at the Facility ranging as high as 10,400 ppm of PCBs.

2

(3d Am. Compl. [Doc. # 52] at ¶ 16.)  Additionally, Plaintiffs allege that in 1988 and 1989, PBI removed Underground Storage Tanks ("USTs") at the facility that previously contained gasoline, alcohol, nail polish remover, and fuel oil.  (*Id.* at ¶ 21.)

In 2005, while PBI occupied Barry Place under a sublease with the LLC (which itself had leased Barry Place from Whisper), sediment impacted with polychlorinated biphenyls ("PCBs") was discovered in a pond at Innis Arden, which is adjacent to Barry Place. Plaintiffs further allege that contamination has been detected in soil samples from Barry Place (*id.* at ¶ 22) and that up to 62,000 milligrams per kilogram of total petroleum hydrocarbons were detected in one soil sample at or near the site of a former UST at Barry Place (*id.* at ¶ 23).

In August 2006, Innis Arden filed suit against both PBI and Pateley LLC under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607, seeking remedy for the alleged release of PCBs from the Barry Place property onto its property.  *See Innis Arden Golf Club v. Pitney Bowes, Inc.*, Civ. No. 3:06cv1352 (JBA) (D. Conn.) (the "Innis Arden Action").  PBI undertook to defend and to indemnify Pateley LLC against any or all liabilities in the Innis Arden Action beginning in June 2007, paying the law firm Pullman & Comley LLC to jointly defend them.  (Rosen Aff. [Doc. # 58].)  On September 12, 2008 the law firm Murtha Cullina LLP ("Murtha Cullina") contacted representatives from Whisper and Pateley LLC to discuss their representation as "co-plaintiffs in a lawsuit that may be filed against" PBI "in connection with environmental contamination at the Barry Place property."  (Sept. 12, 2008 Letter from Mark S. Sussman, Ex. 2 to Pl.'s Suppl. Rule 56(a)1 Submission [Doc. # 171], at 1.)  Murtha Cullina began its

representation of the LLC in the Innis Arden Action in October 2008.  In November 2008, PBI discontinued its defense of Pateley LLC in the Innis Arden, and Murtha Cullina took it over.

On December 1, 2008, Murtha Cullina began billing Pateley LP for its defense of Pateley LLC.  (Invoices from Murtha Cullina to Pateley LP, Ex. 3 to Pl.'s Suppl. Rule 56(a)1 Submission [Doc. # 171], at 1.)  Plaintiffs proffer ten invoices from Murtha Cullina to the LP for fees and costs totaling $277,505.26, all of which has been paid by the LP.  (Sussman Aff. Supp. Pl.'s Suppl. Rule 56(a)1 Submission [Doc. # 171-1] at ¶ 4.)

II.      Defendant's Motion to Dismiss

Pursuant to Federal Rule of Civil Procedure 12(b)(6), PBI moves to dismiss all nine counts of the Third Amended Complaint in its entirety for failure to state a claim upon which relief may be granted.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Even without detailed allegations, a claim will be found facially plausible so long as "the plaintiff pleads non-conclusory factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.

1.      Count One:  CERCLA Cost Recovery

Plaintiffs seek declaratory judgment that Defendant is liable under CERCLA for such costs and expenses as have been or will be incurred for the investigation, remediation, and monitoring of hazardous substance contamination at Barry Place and an order requiring PBI to investigate, remediate, and monitor such contamination there.  Plaintiffs' CERCLA claim

against PBI alleges that PBI is both an owner and operator[1] of the Barry Place property under CERCLA for purposes of the statute.  PBI moves to dismiss the CERCLA claim on the basis that Plaintiffs have failed to allege facts that, if taken as true, would establish that PBI is owner or operator of the land.

CERCLA imposes strict liability for environmental contamination upon entities including the "owner and operator of a vessel or a facility"[2] and "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of."  42 U.S.C. § 9607(a)(1), (2).  When entities are determined to be potentially responsible parties ("PRPs"), they may be compelled to clean up a contaminated area or reimburse the government for its past and future response costs.[3]

---

[1] Owners and operators may incur the same liability under CERCLA.  The statute distinguishes between them to ensure that entities that operate facilities but do not own them are not insulated from liability.  "Lessees may frequently be liable as operators but most lessees are not owners within the meaning of § 9607(a)."  *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 329 (2d Cir. 2000).

[2] "Facility" is defined in CERCLA as

    (A)    any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or

    (B)    any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

[3] Under CERCLA, PRPs are liable for:
(A) all costs of removal or remedial action incurred by the United States

*See Burlington N. & Santa Fe Ry. Co. v. United States*, 129 S. Ct. 1870, 1878 (2009).  To withstand a motion to dismiss, Plaintiffs must sufficiently allege that PBI was owner and/or operator of the facility at Barry Place at a time when hazardous substances were discharged at that property.

a.    Owner liability

It is undisputed that PBI was not record owner of Barry Place after December 13, 1978.  Pateley LP held an estate for years in Barry Place from 1978 until 2001, after which it assigned all rights and interests it had in the property to the newly formed Pateley LLC.  Hirey (and then Whisper) maintained a remainder interest in the land.  Thus, PBI contends that Plaintiffs cannot allege sufficient facts to demonstrate that it was a "*de facto* owner" and strictly liable for contamination costs as a PRP under Section 9607(a)(1).

For purposes of CERCLA, a lessee may be held liable as an "owner" pursuant to a *de facto* ownership theory even if it does not hold title to the property in question.  Under this theory, "certain lessees may have the requisite indicia of ownership vis-à-vis the record owner to be *de facto* owners and therefore strictly liable."  *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 330 (2d Cir. 2000).  The Second Circuit has set forth a

---

Government or a State or an Indian tribe not inconsistent with the national contingency plan;  (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a)(4).

non–exhaustive list of criteria to assess whether such non–record *de facto* ownership exists. The inquiry focuses on obligations associated with ownership, including

> (1) whether the lease is for an extensive term and admits of no rights in the owner/lessor to determine how the property is used; (2) whether the lease cannot be terminated by the owner before it expires by its terms; (3) whether the lessee has the right to sublet all or some of the property without notifying the owner; (4) whether the lessee is responsible for payment of all taxes, assessments, insurance, and operation and maintenance costs; and (5) whether the lessee is responsible for making all structural and other repairs.

*Id.* at 330–31.  As examples of arrangements in which lessee have *de facto* ownership status that would give rise to strict liability, the Second Circuit referred to 99–year leases and sale–leasebacks, and explicitly that may not "serve to insulate the former–owner/lessee from owner liability if the lessee actually retains most rights of ownership with respect to the new record owner."  *Id.* at 331.

The Third Amended Complaint claims that PBI had a *de facto* ownership interest in Barry Place because the lease created by PBI's sale–leaseback "imposes upon Defendant all costs and obligations of every kind relating to [Barry Place] as though it were the sole owner" and "generally puts the burdens of ownership on the Lessee." (3d Am. Compl. at ¶¶ 31, 32.) Pateley has further alleged that the lease was for a term of 25 years and contained renewal options extending the term (*id.* at ¶ 34); is not subject to termination by Pateley unless PBI is in default (*id.* at ¶ 37); gives PBI the right to sublet Barry Place without Pateley's permission (*id.* at ¶ 38); makes PBI responsible for paying all taxes and operating costs (*id.* at ¶ 39); and requires that PBI bear responsibility for all maintenance (*id.* at ¶ 43).  Based on these allegations PBI is readily distinguished from the defendant held not to be a *de facto* owner in *Commander Oil.*  That lessee had a five year lease with one option for renewal, was

7

required to obtain written consent from Commander Oil before making improvements, and was required to obtain written approval to sublet the property. *Commander Oil Corp.*, 215 F.3d at 331. PBI's alleged indicia of ownership are much stronger.

PBI argues that the *Commander Oil* standard requires allegations of ultra-hazardous activities during occupancy of property for that occupancy to amount to *de facto* ownership, which Pateley has not alleged. However, the Second Circuit in *Commander Oil* merely drew a parallel between the reasons underlying strict liability in the CERCLA context and in the ultra-hazardous activity context, as guided by the court's analysis of ultra-hazardous activity in *United States v. FMC Corp.*, in which it held that "[w]hen one enters into a business or activity for his own benefit, and that benefit results in harm to others, the party should bear the responsibility for that harm." 572 F.2d 902, 907 (2d Cir. 1978). Neither *FMC Corp.* nor *Commaner Oil* suggest that ultra-hazardous activity is a required indicium of *de facto* ownership. Thus, Plaintiffs' allegations that PBI functionally acted as owner of the property, even though it was not record owner, are legally sufficient under Rule 12(b)(6).

### b. Operator Liability

PBI also moves to dismiss Plaintiffs' claim that it is liable for remediation costs under Section 9607(a) as an operator, arguing that Plaintiffs' claim invites "expan[sion of] CERCLA *operator* liability to any entity that *leases* a contaminated property and monitors compliance with general environmental regulations during the period of the lease." (Def.'s Reply Mem. Supp. Mot. Dismiss [Doc. # 73] at 3 (emphases in original).) PBI suggests that the Court should look to whether PBI had "authority to control the cause of the contamination at the time the hazardous substances were released into the environment." (Def.'s Mem. Supp. Mot. Dismiss [Doc. # 54] at 9 (quoting *Geraghty & Miller, Inc. v. Conoco*

*Inc.*, 234 F.3d 917, 928 (5th Cir. 2000).)  In *United States v. Bestfoods*, 524 U.S. 51, 52 (1998), the Supreme Court clarified that "an operator must manage, direct, or conduct operations specifically related to the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."

Plaintiffs' complaint alleges that from 1967 through the present, PBI has been solely responsible for applying for an EPA hazardous waste identification permit; generating waste at Barry Place; storing that waste at Barry Place; developing an underground tank and piping system at Barry Place to hold petroleum and hazardous substances; using hazardous substances; "managing the use of electrical transformers at the facility, including the handling of PCB-contaminated dielectric fluids;" responding to a release of those fluids from leaky valves; and notifying the Connecticut Department of Environmental Protection that of the presence of elevated levels of PCBs at Barry Place; and in 1988 or 1989, "removed Underground Storage Tanks ('USTs') at the Facility that previously contained gasoline, alcohol, nail polish remover and fuel oil" and in the process, "failed to comply with the Underground Storage Tank Regulations." (3d Am. Compl. at ¶ 21.) These allegations amply support a claim that PBI's operations related to the hazardous materials release, which produced the contamination sought to remedied and therefore that it was an operator for purposes of Section 9607(a)(1).

2.      Counts Two and Three: Breach of Contract

Counts Two and Three of the complaint charge PBI with breaching its contractual obligations to indemnify Pateley LLC for costs associated with environmental contamination evaluation and remediation.  PBI contends that those claims for indemnification based on CERCLA liability must be dismissed because CERCLA had not been enacted when the lease

was signed, and the lease was not intended to cover costs incurred for violations of future regulatory schemes. PBI further argues that the contractual provision at issue, "strictly construed, does not require PBI to indemnify Pateley for the damages sought in Count Two, or for the indemnity sought in Count Three, because the indemnity provision does not contemplate indemnification for costs pertaining to environmental remediation." (Def.'s Mem. Supp. Mot. Dismiss at 14.)  The Lease provides that

> Lessee shall defend all actions against Lessor with respect to, and shall pay, protect, indemnify and save harmless Lessor from and against any and all liabilities, losses, damages, costs, expenses (including reasonable attorneys' fees and expenses) causes of action, suits, claims, demands or judgments of any nature (a) to which Lessor is subject because of its estate in the Premises or (b) arising from (i) injury to or death of any person, or damage to or loss of property, on the Premises or on adjoining sidewalks, streets or ways, or connected with the use, condition or occupancy of any thereof, (ii) violation of this Lease, (iii) any act or omission of Lessee or its agents, contractors, licensees, sublessees or invitees, and (iv) any contest referred to in paragraph 17.

(Lease Agreement, Ex. C to Pl.'s Rev. 56(a)1 Statement [Doc. # 99], § 8.)

The Second Circuit has found an indemnification clause in a pre-CERCLA contract to include prospective obligations if its terms are "either specific enough to include CERCLA liability or general enough to include any and all environmental liability." *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 15 (2d Cir. 1993). *Olin* involved a pre-CERCLA agreement for the sale of an aluminum business with an explicit requirement that the purchaser indemnify Olin for all liabilities "as they exist on the Closing Date or arise thereafter," which was held to encompass CERCLA liability. *Id.* Conversely, courts applying the *Olin* standard to pre-CERCLA indemnification clauses that are expressly limited to circumstances that exist at the time closing, or to specific types of liabilities or disputes, have

10

excluded coverage for CERCLA liability. *See, e.g.*, *Georgia–Pacific Consumer Prods., LP v. Int'l Paper Co.*, 566 F. Supp. 2d 246, 251 (S.D.N.Y. 2008) (where indemnification clause in pre-CERCLA lease provided that lessee would assume "debts and liabilities of every time . . . as the same exist on the date hereof" there was no liability for CERCLA-related costs); *Buffalo Color Corp. v. Allied Signal, Inc.*, 139 F. Supp. 2d 409, 419 (W.D.N.Y. 2001) (indemnification provision limiting purchaser's liability to "losses or liabilities, including attorneys fees, suffered or incurred by Seller for reason of . . . all obligations and liabilities relating to the [purchaser's] [b]usiness arising out of claims made, or suits brought by employees or third parties for injury, sickness, disease or death of any person, or any damage to any property, on or after the Closing Date, in either case which resulted from . . . fault or defect, patent or latent, in the physical assets . . . whether or not such fault or defect existed prior to the closing date" and specifying that "all other liabilities . . . would be retained by the seller" appeared sufficiently "limited to specific disputes or particular types of liability" that CERCLA liability was excluded because there was no "clear, unambiguous reference to such liability").

Construing the Lease's terms to carry their ordinary meaning, *see B&D Assoc., Inc. v. Russell*, 73 Conn. App. 66, 70 (2002) ("the language must be given its ordinary meaning unless a technical or special meaning is clearly intended"), the indemnification clause here requires PBI to indemnify Pateley LLC for any costs arising from PBI's estate in the premises or "any act or omission" of PBI or its licensees, sub-lessees, invitees, without regard to timing or type of liability-producing conduct.[4] Thus, Plaintiffs allege that PBI, as operator

---

[4] Connecticut law directs the Court that the Lease be construed "as a whole and in such a manner as to give effect to every provision if reasonably possible." *B&D Assoc. Inc.*,

of Barry Place, was responsible for CERCLA violations, either because of Plaintiffs' estate in the Premises or because of Defendant's acts or omissions, triggers the indemnification provision of Section 8.

3.     Counts Four, Five, and Six: Failure to Defend or Indemnify[5]

In Counts Four, Five, and Six, Plaintiffs claim that PBI breached its lease contract with Plaintiffs by failing to defend or indemnify them for costs associated with defense of the Innis Arden Action.  PBI moves to dismiss these three counts because Section 8 of the lease agreement with Plaintiffs did not create an obligation to defend or indemnify Plaintiffs in the Innis Arden Action because Plaintiffs were not a party to the Innis Arden Action because of their estate in the Premises.  At issue then is whether IAGC's action against Pateley LLC arises out of Plaintiffs' "estate in the Premises" including Plaintiffs' estate for years in the land and ownership of the buildings and facilities.

PBI reads "estate in the Premises" as a term of art that refers only to estates created by leases, and thus, only the relationships between lessor and lessee or landlord and tenant. (Def.'s Mem. Supp. Mot. Dismiss at 7, 16.)  PBI's reliance on *Town of Newington v. Young*, 47 Conn. Super. 65, 92 (Conn. Super. 2000), is misplaced.  *Young* explained that a lease

---

73 Conn. App. at 70.  Doing so here, Section 8 of the Lease must be read alongside Section 12, which refers to "Lessee's obligations under [Section] 8 to fully indemnify Lessor against all liability in any way arising out of the Premises," clarifying any ambiguity under [Section] 8 as to PBI's obligation to indemnify the LLC for costs arising from the premises, which Plaintiffs claim to include the Innis Arden Action.

[5]  IAGC has appealed the summary judgment against it.  An affirmance by the Second Circuit would moot Counts Five and Six, in which Plaintiffs seek a declaration of indemnification against PBI for liability and damages assessed against the LLC in the Innis Arden Action.

"creates an interest or estate in the premises," it does not thereby suggest that estates in premises are *only* created through leases.  In other words, although leases are contracts that create estates in the premises, other transactions can create such estates as well.[6]  The Court must therefore determine the interests to which "estate in the Premises" refers in the Lease between PBI and Pateley LP and subsequently assigned to Pateley LLC.

"Estate" is defined in *Black's Law Dictionary* as "[t]he amount, degree, nature and quality of a person's interest in land or other property; esp., a real–estate interest that may become possessory, the ownership being measured in terms of duration." *Id.* at 626  (9th Ed. 2009).  Richard Burke's treatise on property law in Connecticut provides historical context for the present-day definition, explaining that the term is derived from feudal England in which only free men could own or hold real estate, thus giving rise to the term "freehold estate."  *Connecticut Real Property Law* 266 (Richard C. Burke, ed., 1984).  From the term estate, "many classifications, such as possessory vs. nonposessory rights, present or future

---

[6]  Connecticut courts have referred to "estates in the premises" in cases involving some form of possessory or non-possessory interest in specifically delineated land other than interests created by leases.  *See Buchanan v. Flandreau*, 12 Conn. Supp. 108, 3 (1943) (recognizing that a "spring right" encumbrance on land constituted an "outstanding estate in the premises in a third party by express grant"); *Zandri v. Tendler*, 123 Conn. 117, 600 (1937) (recognizing that if a grantor "is seized or possessed of a particular estate in the premises" and that estate is conveyed in a deed, "the grantor and all persons in privity with him shall be estopped from ever afterwards denying that he was so seized and possessed at the time he made the conveyance").  The Supreme Court has recognized that an "estate in the premises" can be created through the sale of land, s*ee Woodworth v. Northwestern Mut. Life Ins. Co.*, 185 U.S. 354, 356 (1902) (under Nebraska law, a deed to property "shall vest in the purchser as good and perfect an estate in the premises as was vested in the execution debtor at or after the time when the land became liable for the satisfaction of the judgment") and through encumbering land with a mortgage, *see Barnitz v. Beverly*, 163 U.S. 118 (1896) ("[t]his law gives to the mortgagor and to the judgment creditor an equitable estate in the premises").

interests and several other legal incidents of ownership evolved." *Id.* Additionally, the term "Premises," capitalized in both Section 8 of the lease agreement and the definitional Section 1, is defined as those "premises . . . consisting of (i) the land . . . (ii) all buildings and other improvements . . . now or hereafter located on the Land . . . and (iii) the respective easements, rights and appurtenances relating to the Land and the Improvements."

Therefore, Plaintiffs' "estate in the Premises" is their respective interest, possessory or non-possessory, in the land, buildings, improvements, and easements at Barry Place, specifically an estate for years followed by a leasehold estate in the land, and ownership in fee simple of the buildings, structures, and improvements located on the land. (3d Am. Compl. at ¶ 3.) These interests do not grow out of the LP's lease of Barry Place to PBI; instead, the LLC's "estate in the Premises" was derived first from the LLC Agreement in which the LP gave to the LLC its "ownership interest" in Barry Place, and thereafter from its execution of the option to lease Barry Place from Whisper, which the LLC exercised in 2001. *See Young*, 47 Conn. Supp. at 92 ("A lease is a contract which creates an interest or estate in the premises." (citations omitted)). These interests are what exposed the LLC to liability in the Innis Arden Action. It is irrelevant whether IAGC was mistaken about the nature of Plaintiffs' actual ownership or control of the Barry Place land.[7] In arguing that the "estate in the Premises" referenced in the Lease is different from the LLC's interest that gave rise to potential liability in the Innis Arden Action and that the LLC would have been named "to that action even if the Lease had never been entered into with PBI" (Pl.'s Mem. Opp'n Mot.

---

[7] In the Innis Arden Action, IAGC sued the LLC on the grounds that at relevant times, a Pateley entity "either owned and controlled or controlled the property known as 23 and 50 Barry Place." *See generally* Second Amended Complaint at ¶ 3, *Innis Arden Golf Club v. Pitney Bowes Inc.,* No. 3:06cv1352(JBA) (D. Conn. Nov. 13, 2006).

Dismiss at 1), PBI disregards the provision of the Lease that required indemnification and defense for any suit brought against Plaintiffs because of any interest they had in Barry Place.

Moreover, Section 8 of the Lease calls for indemnification of the LP (and the LLC after assignment) if sued because of its estate in the Premises *or* because of other actions or omissions for which PBI is responsible.  Because of the use of the disjunctive "or," what matters in determining whether PBI is liable to Plaintiffs is whether the LLC was sued because of its interests in the Barry Place land, buildings or improvements upon it, and easements or rights attached to it—regardless of PBI's actions or omissions.  Whether the LLC would have been sued in PBI's absence has no bearing on that determination.  PBI's alarm that Plaintiffs' interpretation would "require PBI to defend or indemnify Pateley for *any* lawsuit that would have been commenced" (Def.'s Mem. Supp. Mot. Dismiss at 16) is unfounded, as Section 8 only requires PBI to indemnify or save harmless Plaintiffs against liabilities that arise because of their specific interests in Barry Place, which are sufficiently alleged in the present matter.

Plaintiffs have alleged that the LLC was sued because of its interest in Barry Place.  Section 8 of the Lease calls for PBI to indemnify Plaintiffs for costs arising out of the Plaintiffs' respective estates in the Premises.  Plaintiffs allege that PBI has failed to do so.  This states a claim for breach of contract, so Defendant's motion to dismiss Counts Four, Five, and Six is denied.

### 4.    Count Seven

PBI moves to dismiss Count Seven of the Third Amended Complaint, which seeks declaratory and injunctive relief under Connecticut's Environmental Protection Act ("CEPA"), Conn. Gen. Stat. § 22a-16.  PBI argues that Plaintiffs should have brought this

claim in state court and that the relief Plaintiffs seek exceeds what is statutorily authorized.

PBI points to the statutory text, which provides in pertinent part:

> any . . . legal entity may maintain an action in the superior court for the judicial district wherein the defendant is located, resides or conducts business . . . for declaratory and equitable relief against . . . any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction[.]

Conn. Gen. Stat. § 22a-16.

Plaintiffs note that the statute grants a party discretion to file in Superior Court and that federal courts have exercised subject–matter jurisdiction over CEPA claims not initiated in state court. *See, e.g., Durham Mfg. Co. v. Merriam Mfg. Co.*, 294 F. Supp. 2d 251 (D. Conn. 2003); *Albahary v. City & Town of Bristol*, 963 F. Supp. 150 (D. Conn. 1997).

PBI argues that this count should be dismissed because the relief requested[8] is not authorized by Section 22a–16. This argument is unavailing, however, because Section 22a-16 grants to the Court discretion to impose conditions on a defendant that it determines are necessary to protect the public trust, *see, e.g., Calabrese v. McHugh,* 170 F. Supp. 2d 243, 261 (D. Conn. 2001) ("If the defendant is found liable, the court may . . . impose such conditions on the defendant as are required to protect the public trust in the air, water and other natural resources from unreasonable pollution."), even if the Court's determination of what relief

---

[8] Plaintiffs seek "[a] declaration that the Defendant is obligated to remediate the Facility to meet the applicable RSR Criteria, the National Contingency Plan, 40 C.F.R. §§ 300 *et seq.*, and the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.* ('TSCA'), and as may be required to satisfy other applicable state and federal laws and regulations" and "[i]njunctive relief requiring the Defendant to remediate the Facility to meet" those standards. (3d Am. Compl. at ¶ 115(a)(b).)

is necessary is made with reference to federal standards such as the Remediation Standard Regulations ("RSR") Criteria. *See, e.g.*, *Durham Mfg. Co.*, 294 F. Supp. 2d at 271 ("The discharge, release or disposal of contaminants exceeding the criteria set forth in the RSRs is prima facie evidence of unreasonable pollution, impairment or destruction of the air, water or other natural resources of the State."). A court adjudicating a CEPA dispute may thus require a defendant to comply with federal standards, and Plaintiffs may request declaratory and injunctive relief—both authorized under Section 22a–16—to meet those standards.

Finally, relying on *Pestey v. Cushman*, No. 07cv9470091, 2000 WL 157920 (Conn. Super. Jan. 28, 2000), PBI argues that Count Seven should be dismissed because Plaintiffs seek only the vindication of a private right. In *Pestey*, the Superior Court held that "[t]he purpose of General Statutes § 22a-16 is not to create a vehicle for the vindication of private rights, but rather to enlist the assistance of citizens to protect the public trust in the air, water, and other natural resources of the state." *Id.* at * 3. However, *Pestey* also explained that "[n]owhere does the legislation suggest that litigants who may incidentally benefit from the granting of equitable relief are not entitled to seek such relief against pollution on behalf of the citizenry." *Id.* Count Seven does not seek to vindicate private rights only; rather, it states that "the soil, groundwater and/or surface water at, under and around the Facility are the natural resources of the State of Connecticut" (3d Am. Compl. at ¶ 112), and PBI's "activities have or are reasonably likely to cause the unreasonable pollution of the state" (*id.* at ¶ 114). While Plaintiffs allege that they will suffer irreparable harm in the absence of an injunction, they reference the damage to Connecticut's resources caused by or likely to be caused by Defendant, concerns that are covered by CEPA. Because Plaintiffs have alleged a violation of CEPA, can bring such a claim in federal court, and have requested relief that

this Court has discretion to provide, Defendant's motion to dismiss Count Seven is denied.

     5.     Count Eight

In Count Eight, Plaintiffs request declaratory relief related to its CERCLA, contract, and CEPA claims.  Plaintiffs allege that "[a]bsent judicial determination setting forth the parties' rights and obligations with respect to these costs and legal liabilities, a multiplicity of actions may result." (3d Am. Compl. at ¶ 121.)  PBI moves to dismiss on the grounds that their other counts would provide Pateley with adequate relief, rendering declaratory relief unnecessary. Under Federal Rule of Civil Procedure 57, "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Nonetheless, "[a]lthough the availability of alternative remedies is not a bar to declaratory relief, Fed. R. Civ. P. 57, the district court may in its discretion refuse declaratory relief if the alternative remedy is more appropriate." *Smith v. Metro. Prop. & Liab. Ins. Co.*, 629 F.2d 757, 759–60 (2d Cir. 1980).  Because Rule 57 does not preclude declaratory relief simply because alternative remedies exist, and Plaintiffs allege that actual controversies exist as to future response costs that could give rise to a "multiplicity of actions," Defendant's motion to dismiss Count Eight is denied.

     6.     Count Nine

Finally, Plaintiffs request attorneys fees in Count Nine, and PBI moves to dismiss only on the grounds that no independent cause of action exists for attorneys' fees under Connecticut law.  Connecticut adheres to "the general rule of law known as the 'American Rule,'" which holds that "a prevailing litigant ordinarily is not entitled to collect a reasonable attorney's fees from the opposing party as part of his or her damages or costs." *Town of*

*Brookfield v. Candlewood Shores Estates, Inc.* 201 Conn. 1, 14 (1986).  There are, however, exceptions to this rule, including when the claim is "based upon statutory or contract provisions authorizing the recovery of attorney's fees by a prevailing litigant." *Id.* at 15.

Plaintiffs' claim is based in contract, specifically on Sections 8 and 19(c) of the Lease.  Section 19(c) provides that "[i]f Lessee shall be in default in the performance of any of its obligations hereunder, Lessee shall pay to Lessor on demand, all expenses incurred by Lessor as a result thereof, including reasonable attorneys' fees and expenses." (3d Am. Compl. at ¶ 126.)  Rather than bringing Count Nine as a stand-alone cause of action for attorneys fees, Plaintiffs bring this claim on a breach-of-contract theory.  Therefore, this claim falls within the exception to the American Rule, and the Motion to Dismiss will be denied as to this count.

III.    Plaintiffs' Motion for Summary Judgment[9]

Plaintiffs move under Federal Rule of Civil Procedure 56 for summary judgment on Count Four, alleging that PBI breached Section 8 of the Lease by failing to defend the LLC in the Innis Arden Action.  Plaintiffs contend that "the [Innis Arden Action] against Pateley [LLC] is an action based solely on Pateley's interest in the Barry Place property," thus triggering PBI's indemnification obligations under the Lease.  (Pl.'s Mem. Supp. Mot. Partial Summ. J. [Doc. # 56] at 7.)  PBI argues that neither the LP nor the LLC has standing to raise a claim under Section 8 of the Lease because the LLC has not actually paid for legal expenses

_____

[9] The Court will apply the familiar summary–judgment standard without recitation in detail.  Fed. R. Civ. P. 56(c)(2); *see, e.g.*, *Davis v. City of Hartford*, 601 F. Supp. 2d 488, 491 (D. Conn. 2009).

in the Innis Arden Action and the LP was not sued and has no rights under the Lease, which was assigned to the LLC in 2001.[10]

> A.    The LLC

As the Court concluded above in denying PBI's motion to dismiss, PBI's argument is incorrect and inapposite that the LLC cannot rely on Section 8 of the Lease because the LLC's "estate in the Premises" is a landlord status that is unrelated to its alleged liability in the Innis Arden Action.  Rather, the LP's ownership interest in Barry Place, which the LP assigned to the LLC through the LLC Agreement—which gave the LLC all contractual rights and obligations under the Lease Agreement to the LLC and divested the LP of those rights and obligations—was established prior to or in conjunction with, but not by, the Lease with PBI.  Thereafter, the LLC continued to have an "estate in the Premises," now based on its having leased Barry Place from Whisper.  The Whisper–LLC lease gave the LLC an estate in the Premises.  *See Young*, 47 Conn. Supp. at 92.  Moreover, the Lease refers to the "estate in the Premises" of the "Lessor," which was originally Pateley LP but which became Pateley LLC by virtue of the March 2001 LLC Agreement.  The LLC's interest—first obtained through the LLC Agreement and then through the Whisper–LLC lease agreement—gave rise to the LLC's alleged liability in the Innis Arden Action under CERCLA because the LLC "either owned and controlled or controlled" the Barry Place property.  (2d Am. Compl. in

---

[10] PBI has moved to file under seal Exhibit B to its memorandum in opposition to summary judgment, which is an affidavit "subject to a joint defense and confidentiality agreement between PBI and Pateley Associates LLC" in the Innis Arden Action.  (Def.'s Mot. Seal [Doc. # 71] at 1.)  Plaintiffs do not object to this motion, which will be granted because the public interest in access to the affidavit is outweighed by the parties' ability to put on a joint defense in the Innis Arden Action, particularly because the Court does not rely on the affidavit in resolving the two motions at issue in this ruling.

Innis Arden Action, Ex. A to Submission of Authorities [Doc. # 59], at ¶ 3.)  The Court has already concluded that Section 8 of the Lease contractually binds PBI to indemnify the LLC for "any and all liabilities, losses, damages, costs, expenses (including reasonable attorneys' fees and expenses) causes of action, suits, claims, demands or judgments of any nature" (Lease Agreement, § 8) that the LLC incurred in the Innis Arden Action.

PBI contends that it owes the LLC nothing because the LLC has incurred neither costs associated with the Innis Arden Action nor liability to reimburse the LP for attorneys fees and costs that the LP paid to Murtha Cullina for representation of the LLC in the Innis Arden Action.  Plaintiffs respond that the LLC has incurred liability because it is obligated to indemnify the LP for attorneys fees the LP paid to Murtha Cullina for its representation.

Under Connecticut law,

> indemnity agreements fall broadly into two classes, those [in which] the contract is to indemnify against liability and those [in which] it is to indemnify against loss.  In the first, the cause of action arises as soon as liability is incurred, but in the second it does not arise until the indemnitee has actually incurred the loss. . . . Whe[n] an indemnity agreement, however, indemnifies against liability as well as against loss . . . the indemnitee does not have to wait until the loss occurs, but may sue on the agreement as soon as liability is incurred.

*Amoco Oil Co. v. Libery Auto & Elec. Co.,* 262 Conn. 142, 149 (2002) (citing *24 Leggett St. Ltd. P'ship v. Beacon Indus., Inc.*, 239 Conn. 284, 306 (1996) (indemnification clause, which obligated seller–defendant to indemnify, defend, and hold harmless land purchaser–plaintiff for any "liabilities, losses, damages, costs or expenses (including reasonable attorneys' fees) of any nature arising from the environmental condition of or problem with the Property, which condition or problem arose prior to Closing," covered indemnification of both loss and liability, requiring seller to indemnify purchaser for purchaser's liability for future costs

not yet paid for remediation of land contaminated with "special wastes," that violated Connecticut regulations)).   Under an agreement to indemnify against loss only, "it is theoretically impossible for an indemnitee to have an actionable claim against the indemnitor until the indemnitee actually has paid something it is legally obligated to pay." *Id.* at 150.  "Conversely an action to enforce an agreement to indemnify against liability only would accrue as soon as an indemnitee becomes liable to a third party," *i.e.*, obligated to pay a third party.  *Id.*

Although PBI argued[11] and Plaintiffs' counsel conceded during oral argument that the LLC has not as of yet paid Murtha Cullina, and therefore has not incurred loss, Section 8 of the Lease explicitly indemnifies "all liabilities [and] losses."  Thus, the relevant question is whether the LLC had, as Plaintiffs contend, incurred liability to repay the LP for attorneys fees and costs in the Innis Arden Action.  It is undisputed that the LP paid Murtha Cullina for the defense of the LLC in the Innis Arden Action.  Plaintiffs maintain that the LLC Agreement obligates the LLC to repay the LP for any costs incurred as a result of litigation, including legal costs.  They contend that "[t]he LP's action to provide the LLC with a defense in the [Innis Arden Action] once PBI withdrew its [joint] defense is plainly within the scope

---

[11] PBI cites *Schneider v. National Railroad Passenger Corp.*, 987 F.2d 132, 138 (2d Cir. 1993), in which the Second Circuit held that "an insured cannot recover costs not incurred" to support its argument that because the LLC has incurred no costs, it has no cause of action. Yet unlike the plaintiff in *Schneider*, who did not claim that she had an obligation to reimburse a third party for covering her legal expenses, the LLC alleges that is obligated to repay the LP for paying for the LLC's legal expenses.  In *Schneider*, the costs of attorney fees were covered by Traveler's Indemnity Company, and the plaintiff sought indemnification for those fees even though it never suggested that it was obligated to repay Traveler's Indemnity Company.  Here, by contrast, the LLC maintains that it is liable to the LP to compensate it for attorney fees paid on the LLC's behalf.

of authority granted to the LP under the LLC Agreement, and any losses incurred by the LP in providing such a defense are to be paid by the LLC under the [LLC] Agreement." (Pl.'s Resp. to Def.'s Suppl. Mem. Opp'n [Doc. # 177] at 6.)

The LLC Agreement, which created the LLC in accordance with the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 *et seq.*, establishes the LP as the sole equity member and Member Manager of the LLC. Section 17 of the LLC Agreement, entitled "Exculpation and Indemnification," states that

> [t]o the fullest extent permitted by applicable law, the [LLC] hereby indemnifies and holds harmless each Covered Person for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement.

Covered persons are defined to include members and managers of the LLC, such as the LP. (LLC Agreement, Ex. G to Rev. Stmt., at § 17.2.) Section 8.2(ii) authorizes the Member Manager, which is the LP, to "bring and defend on behalf of the [LLC] actions and proceedings at law or in equity" "at the expense of the [LLC ]" (*id.* § 8.2(ii)), and Section 17.2 requires that the LLC indemnify the LP for any expenses it incurs in such a defense, taken in good faith. In accordance with Sections 8.2(ii) and 17.2 of the LLC Agreement, after December 2008, the LP paid for the defense of the LLC, which was an "act . . . performed . . . by [a] Covered person" that resulted in a "loss."[12]

---

[12] PBI argues that whether the LP actually retained Murtha Cullina to represent the LLC in the Innis Arden Action remains a material issue in dispute, although PBI does not dispute that the LP actually paid Murtha Cullina for this work. Neither of the letters proffered by Plaintiffs (Ex. 1, 2 to Pl.'s Suppl. Rule 56(a)1 Stmt. [Doc. # 171]) refer specifically to the Innis Arden Action, to Murtha Cullina's defense of the LLC, or to the LP's contractual obligation to pay Murtha Cullina. Yet it is irrelevant whether the LP was

Nonetheless, PBI has advanced a number of arguments as to why the LLC cannot be obligated to indemnify the LP.  First, PBI suggests that Section 17.2 of the LLC Agreement does not obligate the LLC to indemnify the LP because the "LLC was created to protect the LP from liability as to 23 Barry Place" and therefore, the LLC Agreement's "intent is to protect the LP from losses derived only from legal actions asserted against the LP for acts committed by the LP as a managing member of the LLC."  (Def.'s Surreply [Doc. # 152] at 8.)  According to PBI, Section 17.2 of the LLC Agreement "would only require the LLC to indemnify the LP were the LP to have been sued for acts or omissions that occurred during its management of the LLC."  (Def.'s Suppl. Mem. Opp'n Summ. J. [Doc. # 174] at 10.)  Nowhere does the LLC Agreement specify, however, that its indemnification provision only applies when the LP is sued; rather, it more broadly covers *any* act or omission by the LP, for which it incurs loss, damage, or claim, within the scope of its authority as a Covered Person under the LLC.  The "plain meaning of the words employed" in a broad indemnification provision are enough to "establish the unmistakable intent of the parties," and if such a provision has no limiting exceptions, no exceptions should be read into it.  *Burkle v. Car & Truck Leasing Co., Inc.*, 1 Conn. App. 54, 57 (1983) (a clause indemnifying a buyer "against all liabilities" required indemnification for negligence, even though negligence was not explicitly included, because "[t]here cannot be any broader classification

---

obligated under a retainer agreement with Murtha Cullina to pay the law firm for its defense of the LLC in the Innis Arden Action.  The LLC Agreement authorizes the LP to defend the LLC at the LLC's expense and obligates the LLC to indemnify the LP for costs incurred in that defense, and the invoices in the record, which were issued by Murtha Cullina to the LP for services rendered to the LLC in the Innis Arden Action (*see id.* at Ex. 3), and which it is undisputed the LP paid, show that the LP "defend[ed]" the LLC in accordance with Section 8.2(ii) of the LLC Agreement.

than the word 'all,'" which "[i]n its ordinary meaning . . . leaves no room for exceptions"). As "any" is an all-encompassing word, *see, id.*, the indemnification provision in the LLC Agreement is not limited to covering only actions against the LLC's members, as PBI suggests. Rather, it obligates the LLC to indemnify the LP for all losses the LP incurs in the course of authorized actions taken in good faith—including, as set forth in Section 8.2, defending the LLC when sued.

PBI also points to several provisions in Section 8.8(ii) of the LLC Agreement that limit the LLC's activities.[13] (Def.'s Surreply at 7–8.) PBI urges that Section 8.8(ii), together with the Mortgage and Security Agreement "explicitly proscribe the so-called 'arrangement' whereby the LP paid for the attorneys' fees and costs with the expectation that it would be 'indemnified' by the LLC." (Def.'s Suppl. Mem. Opp'n Summ. J. at 9.) PBI reasons that if

---

[13] Section 8.8(ii) prohibits the Managing Member from allowing the LLC to, among other things, (1) "engage in business or activity other than the ownership, financing, leasing use, operation and maintenance of an interest in the Mortgaged Property, and activity incidental thereto"; (2) "merge into or consolidate with any Person . . . , transfer or otherwise dispose of all or substantially all of its assets unless it is expressly permitted" pursuant to the Morgan Stanley loan documents; (3) "commingle its assets with the assets of any of its members or of any other Person"; (4) "incur debt, secured or unsecured, direct or contingent" with limited exceptions; (5) neglect to "maintain its records . . . apart from those of its members"; (6) enter into "any contract or agreement with its members . . . except on terms that are intrinsically fair [and] commercially reasonable"; (7) "make loans or advances to any other Person, including any member of the Company or Affiliate or buy or hold evidence of indebtedness issued by any Person"; (8) fail to "maintain adequate capital for the normal obligations reasonably foreseeable in its contemplated business"; (9) fail to "maintain separate financial statements and accounting records, showing its assets and liabilities separate and apart frm those of any other person"; (10) fail to "observe all limited liability company formalities"; (11) "pledge its assets for the benefit of any other Person, except pursuant to the" Morgan Stanley Mortgage and Security Agreement; (12) acquire obligations or securities of its members"; and (12) fail to "maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other Person."

the LP entered into an arrangement with the LLC it knew was prohibited by the LLC Agreement, it would be doing so not in good faith and would not be entitled to indemnification under Section 17.2. Yet none of the limitations listed in either document prohibit the LLC from indemnifying its Member Manager for defending it in a lawsuit, and the LP funding the defense of the LLC implicates no activities prohibited in Section 8.2(ii) of the LLC Agreement.[14] Moreover, there is no evidence that the LLC's duty to indemnify the LP created a debt senior debt to that owed to Morgan Stanley and secured by Barry Place, and therefore, the LP's funding the defense in the Innis Arden Action did not violate the terms of the Mortgage and Security Agreement. Meanwhile, other provisions in both the LLC Agreement and the Mortgage and Security Agreement explicitly allow for such indemnification. The LLC Agreement, in Sections 8.2(ii) and 17.2, authorize the LP to pay for the legal defense of the LLC and then obligate the LLC to repay the LP for losses incurred in that defense. The Mortgage and Security Agreement at Section 4.2(z) contemplates the LLC indemnifying its members so long as such an arrangement remains junior to the debt

---

[14] PBI contends that the indemnification arrangement abused the LLC corporate form in violation of Section 8.2(ii)(10), and that the LP and LLC are distinct legal entities and "should be treated as so." ([Doc. # 174] at 20.) However, the LLC Agreement delineates the responsibilities and obligations of the LLC and LP vis-à-vis one another, and there is no evidence that those corporate formalities were violated. The only evidence that PBI points to is that the LP and LLC filed the same tax return. ([Doc. # 174] at 20 (citing Nov. 6, 2009 Oral Ar. Tr. at 78:23–25; 79:1–4).) For tax purposes, however, an LLC that does not elect to be treated as a corporation is "[d]isregarded as an entity separate" from its member. 26 C.F.R. § 301.7701-3(b)(1)(ii); *see also McNamee v. Dep't of Treas., Internal Revenue Serv.*, 488 F.3d 100, 110–11 (2d Cir. 2007) (for purposes of payroll tax, a single-member LLC cannot be regarded as employer if it does not elect to be treated as corporation, because it is disregarded as separate entity from its member). Because the LLC is not a separate entity for tax purposes, its taxes are properly filed along with its single member, the LP.

owed to Morgan Stanley secured by Barry Place.[15]  As nothing in either document expressly prohibits the indemnification arrangement and sections of both documents allow for such a relationship, it is permitted under both.

PBI also argues that during the Innis Arden Action, the LLC intentionally "manipulat[ed] . . . the pleadings," hiding the fact that it never owned the Barry Place property in order to shield Whisper Capital, which was not protected by an indemnification agreement.  (Def.'s Reply Mem. [Doc. # 179] at 6.)  PBI contends that "[t]he LLC, as a putative indemnitee, had an obligation to proceed in good faith when it sought indemnification from PBI," and the LLC's purported "failure to cooperate with the other party's performance" by not disclosing that Whisper Capital was the actual owner of the real property at Barry Place "is not only a breach of the implied covenant of good faith . . . but also is a defense to a claim of nonperformance" (Def.'s Suppl. Mem. Opp'n Summ. J. at 17),

---

[15] The Morgan Stanley Open–End Mortgage and Security Agreement, a contract between the LLC and Morgan Stanley creating a mortgage on the Barry Place property, includes similar limitations on the LLC's activities, and additionally provides that the LLC shall not

> have any obligation to indemnify its partners, officers, directors or members, as the case may be, or have such an obligation only if it is fully subordinated to the Debt and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation.

(Open-End Mortgage and Security Agreement, Ex. T to Am. Statement Material Facts [Doc. # 99], § 4.2(z).)  PBI mischaracterizes this provision as "proscrib[ing] the LLC from . . . indemnifying any member."  (Def.'s Supp. Mem. Opp'n at 12 (emphasis in the original).)  In fact, the LLC is allowed under its agreement with Morgan Stanley to indemnify a member so long as that indemnity obligation remains a junior interest to debt owed to Morgan Stanley.

implicating both the covenant of good faith and fair dealing and the doctrine of prevention. Therefore, PBI argues, it is exempted from indemnification of the LLC. (*Id.*)

In its answer to the Second Amended Complaint in the Innis Arden Action, the LLC responded "Denied" to the allegation by IAGC that the LLC is "the current owner of the property know[n] as 23 and 50 Barry Place." (Answer, *Innis Arden Golf Club v. Pitney Bowes, Inc.*, No. 3:06cv1352 (JBA) (D. Conn. Nov. 2, 2007).) In response to IAGC's allegation in the Innis Arden Action that the LLC "at times relevant to this complaint either owned and controlled or controlled" Barry Place, the LLC responded "Pateley admits . . . that it once owned the real property known as 23 and 50 Barry Place in Stamford." (*Id.*) PBI argues that the latter answer, confirming ownership of Barry Place at one point, was intentionally misleading.

Breach of the covenant of good faith and fair dealing is a cause of action that does not in and of itself excuse nonperformance of contractual obligations,[16] whereas the common–law doctrine of prevention can serve to excuse nonperformance. "[I]t is a defense if [the party alleged to be in breach of contract] can prove that [its] performance was prevented or

---

[16] Under Connecticut law, breach of an implied covenant of good faith and fair dealing is a cause of action, which PBI has not brought against the LLC or the LP. *See, e.g. Keller v. Beckenstein*, 117 Conn. App. 550, 563 (2009) (It is "is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship," and "every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement."). The covenant of good faith and fair dealing requires a showing that (1) a plaintiff and defendants were parties to a contract under which the plaintiff expected to receive certain benefits; (2) the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and (3) that the defendant was acting in bad faith. *See Travelers Property & Cas. Ins. Co. v. Triton Marine Construction Corp.*, 473 F. Supp. 2d 321, 330 (D. Conn. 2007). "Bad faith means more than mere negligence; it involves a dishonest purpose." *Hudson United Bank v. Cinnamon Ridge Corp.*, 81 Conn. App. 557, 576 (2004).

substantially hindered by the plaintiff." 10 John E. Murray, Jr., and Timothy Murray, *Corbin on Contracts* § 947, at 8 (Interim ed. 2002 & Fall 2009 suppl.); *see also In re Trace Int'l Holdings, Inc.*, 284 B.R. 32, 37 (S.D.N.Y. 2002) ("A party who causes a breach is precluded from recovering damages based on the breach or using it as a defense in an action based on [its] own non-performance."). PBI argues that "[t]o fulfill its duty, the LLC was required to move to dismiss IAGC's claims because, as a tenant that never occupied 23 Barry Place, the LLC would have no liability under CERCLA." (Def.'s Reply Mem. at 7.) However, PBI was itself party to the sale–leaseback transaction that created the estate for years in the LP (later the LLC) and the remainder interest in Hirey (later Whisper). (*See* 1978 Deed, Ex. A to Pl.'s Rev. 56(a)1 Statement, at 1.) It sold the LP and Hirey their respective interests in the land and structures at Barry Place and therefore knew that the Deed did not give rise to an ownership interest of the land in the LP. Thus PBI had reason to know that neither the LP nor the LLC had an ownership interest in Barry Place during the time period in question, and PBI and the LLC were jointly represented by Pullman & Comley LLC during the period of time in which the Answer was filed in the Innis Arden Action and a motion to dismiss could have been filed. These circumstances do not show Plaintiffs' bad faith.[17] Thus,

---

[17] In general, "bad faith" "implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Hudson United Bank*, 81 Conn. App. at 576–77. There is no evidence in the summary judgment record that the LLC acted in bad faith, as defined in Connecticut law. The record cannot reasonably support a conclusion that the LLC purposefully deceived PBI as to the nature of its ownership interest in Barry Place to obtain the indemnification benefits it claims, or in any way prevented PBI's performance of its obligations under Section 8 of the Lease Agreement.

Defendant's assertion that Plaintiffs prevented its performance lacks substance and does not excuse Defendant's nonperformance.

Since the LLC incurred liability under Section 17.2 of the LLC Agreement to the LP, which paid for its defense in the Innis Arden Action once PBI abandoned its defense of the LLC, and because PBI never defended or indemnified the LLC thereafter, PBI violated its obligations to the LLC under Section 8 of the Lease and is in breach of that contract. Therefore, summary judgment is granted to Pateley LLC on Count Four in the amount of $277,505.26, the undisputed amount of fees and costs charged by Murtha Cullina and paid by Pateley LP for Murtha Cullina's defense of Pateley LLC in the Innis Arden Action.

B.    The LP

Having assigned to the LLC all of its rights under the Lease, and not having been a party in the Innis Arden Action, the LP does not have standing to enforce an indemnification obligation under Section 8 of the Lease.  During oral argument, Plaintiffs' counsel recognized that the LP had no rights under the Lease and had not been sued by IAGC and suggested that the LP has standing under a subrogation theory.  (Nov. 6, 2009 Oral Arg. Tr. at 59:5–11.)  Because there was no subrogation agreement between the LP and the LLC, any right of subrogation here would be equitable, which "does not arise from any contractual relationship between the parties, but takes place as a matter of equity, with or without an agreement to that effect."  *Wasko v. Manella*, 269 Conn. 527, 532 (2004).  "The object of [legal or equitable] subrogation is the prevention of injustice.  It is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it."  *Id.* at 532 (internal quotations omitted, alteration in *Wasko*).  Because PBI is liable to the

30

LLC under Count Four for failure to indemnify in the Innis Arden Action, equitable subrogation is not warranted, and the LP therefore lacks standing.  Summary judgment is denied under Count Four as to the LP.

IV.     Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss [Doc. # 54] is DENIED as to all counts; Defendant's Motion to Seal Exhibit B to its Memorandum in Opposition to Summary Judgment [Doc. # 71] is GRANTED; and Plaintiff's Motion for Partial Summary Judgment as to Count Four [Doc. # 55] is GRANTED IN PART and DENIED IN PART. The Motion for Partial Summary Judgment is denied as to Pateley Associates, LP, and is granted as to Pateley Associates I, LLC, in the amount of $277,505.26.

IT IS SO ORDERED.

                    /s/
                    Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 31st day of March, 2010.